UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:**<br><br>**KESTREL TECHNOLOGIES, INC.,** *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 12-15052 (JMP)**<br><br>**(Joint Administration To Be Requested)** |

### DECLARATION OF EDWARD L. BISHOP, III
### PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

Edward L. Bishop, III declares and says:

1.  I am the President and Chief Executive Officer of Kestrel Technologies, Inc. ("**Kestrel Technologies**"), and Kestrel Solutions, LLC ("**Kestrel Solutions**") (collectively, "**Kestrel**" or the "**Debtors**"). I am fully familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.  I submit this declaration (i) in support of the petitions of the Debtors for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) pursuant to Local Bankruptcy Rule 1007-2 in support of the Debtors' petitions, and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases.

3.  Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this declaration.

---

[1] The Debtors are the following entities: Kestrel Technologies, Inc., and Kestrel Solutions, LLC. The employer tax identification numbers and addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

## Commencement of Reorganization Proceedings

4. On December 31, 2012 (the "**Petition Date**"), the Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Part I of this declaration describes the Debtors' business. Parts II and III described the circumstances giving rise to the commencement of these chapter 11 cases and the Debtors' efforts to avoid bankruptcy. Part IV describes the Debtors' plan of reorganization. Part V provides additional information required under Local Bankruptcy Rule 1007-2.

## I.

## The Debtors' Business

6. Kestrel is the vendor of computer-based trading systems to financial institutions. Specifically, Kestrel Technologies, as the main operating company, owns all intellectual property rights to its proprietary software known as the RAPTr fixed-income order management system ("**RAPTr**"). RAPTr allows users to publish orders, execute transactions, measure performance and manage the risks of any securities anywhere in the world.

7. Kestrel Technologies also owns 100% of the outstanding membership units of Kestrel Solutions. Kestrel Technologies has granted a non-exclusive license to RAPTr to Kestrel Solutions, and Kestrel Solutions, in turn, re-licenses RAPTr to BondHawk Technologies, LLC ("**BH**"). Kestrel Solutions also owns 351 membership units (approximately 2.3%) of BH. BH is focused marketing RAPTr based on a service bureau business model.

8. Historically, Kestrel's operations included technology consulting, software development and licensing, and financial data publishing. All operations have effectively ceased

and all customer contracts, other than BH, have been terminated or otherwise ended. Kestrel has no full-time employees and I have not received regular compensation for an extended period of time. Almost all—if not all—of the employees have terminated their own employments due to non-payment issues.

## II.

## Events Leading to the Chapter 11 Cases

9. One of the most fundamental problems Kestrel faced was a severe lack of capital. The business that Kestrel was engaged in required enormous amounts of capital to design, build and test the types of sophisticated software systems that it was created to sell. Competitors commonly spent significantly more money to build similar technologies. Kestrel attempted to overcome its lack of capital by engaging in large software development projects for major customers like UBS and Chase Manhattan Bank because they paid for Kestrel's work. In addition, the customers provided Kestrel with advanced system functionality and design information which was necessary for Kestrel to build the types of products it wanted to sell.

10. However, this strategy unraveled in the wake of several key events, including (1) the bursting of the dot-com bubble in March 2000, (2) the September 11, 2001 terrorist attacks, (3) corporate consolidations on Wall Street, and (4) one of the most severe and prolonged recessions in U.S. history. Kestrel was vulnerable to these events because it did not have a sufficient capital cushion to weather the storm.

### A. Kestrel's Significant Deals

11. After Kestrel first released RAPTr in mid-1999, the company managed to consummate several significant deals with major Wall Street customers. For example, UBS selected RAPTr as the front-office system for their global rates desk, and Thomson Financial

entered into an exclusive deal with Kestrel to deploy RAPTr as the standard front-office layer for their *Portia* back-office platform. In addition, Chase Manhattan Bank selected RAPTr as their firm-wide, fixed-income trading platform. Similarly, First Union Bank chose RAPTr as their enterprise-wide, fixed-income order management system. Jeffries hired Kestrel to develop a live, online fixed-income system for government and corporate bonds. Cantor Fitzgerald, moreover, selected RAPTr as the front-office system for their proprietary trading desk.

### B.     Events Impacting Debtors

12.     Shortly after closing the deal with First Union Bank, Kestrel's main sponsor of the RAPTr project left the bank, and as a result, the project was cancelled.

13.     Next, Chase Manhattan Bank merged with J.P. Morgan, which enabled Chase Manhattan to terminate its deal with Kestrel, resulting in a loss of $3 million in projected first-year revenue.

14.     The collapsing of the dot-com bubble had a significant negative impact on Wall Street IT spending. Budgets were dramatically reduced and many projects were frozen or cancelled. For example, Thomson Financial stopped marketing RAPTr and attempted to sell their *Portia* back-office system to raise new capital for themselves.

15.     Opportunities and business for Kestrel continued to fade after the September 11, 2001 terrorist attacks. This event not only extended the multi-year deep freeze on Wall Street, it significantly impaired one of Kestrel's best new clients Cantor Fitzgerald, which lost a significant number of employees in the attack.

16.     The only IT firms that were able to weather the storm were large companies with significant financial resources such as Bloomberg, ION and Charles River Development. Small,

emerging vendors like Kestrel were either rolled up by larger companies or driven out of business altogether.

### III.

### The Debtors' Efforts to Avoid Bankruptcy

17. In March 2010, Kestrel began to implement an out-of-court restructuring plan designed to (1) satisfy in full all taxes (including penalties and interest), (2) negotiate payment with limited number of judgment and trade creditors, and (3) consensually exchange all remaining liabilities (including notes payable, trade creditors and employee back pay) for a prioritized series of Kestrel notes (Class B, C and D), based upon the seniority of the existing claims and leaving intact all current outstanding equity of Kestrel.

18. As part of the plan, management control of Kestrel would have been given to a Creditors' Committee consisting of the 5 largest creditors. Additionally, in exchange for a release on all of personal guarantees, my wife and I would contribute our material assets (excluding our primary residence) to a collateral pool to be available to satisfy the claims of those creditors that have personal guarantees.

19. The Kestrel business was to be restructured along two tranches. First, through a newly-formed subsidiary, Exchange Solutions, Inc. ("**ESI**"), Kestrel would reacquire its software and intellectual property rights in the Electronic Trade Infrastructure technology ("**ETI**") from Dome Technology, Inc. ("**DTI**") in exchange for a $1 million Class B note and an earnout payment. Second, Kestrel would transfer all of its rights, title and interest in RAPTr to BH. ESI and BH would seek separate outside capital and have separate management teams.

20. Kestrel would also issue approximately $2 to $3 million of a new Class A debt that would have priority in terms of payment, at a multiple of 3 to 4 times the amount of new money invested by existing creditors in the restructuring of the company.

21. To begin this process, and fund the restructuring work, Kestrel Solutions received initial funding commitments in the form of bridge loans. Kestrel Solutions received approximately $1,750,000 in financial commitments towards this restructuring process and received approximately $175,000 as advances towards such pledges.

22. However, in late March 2011, it became apparent that the out-of-court restructuring plan would be difficult to achieve and that the bankruptcy court process—while more costly and time-consuming—would have a greater likelihood of success. In part, the out-of-court restructuring plan required consent of all creditors involved, which would be challenging.

## IV.

### The Debtors' Plan

23. The basic components of the Debtors' in-court restructuring plan are set forth below.

24. Technology Funding, LLC ("**Technology Funding**") has committed to provide the Debtors with DIP financing in the amount of $600,000. The DIP Motion sets forth the terms of the DIP financing, including the benefits that such financing will provide to the Debtors' estates.

25. The terms of the DIP financing require the a motion to approve the bidding procedures for the sale of the Debtors' assets as well as a break-up fee to be filed within ten (10) days of the Petition Date. The Debtors must also obtain a court order acceptable to Technology

Funding approving the bid procedures and break-up fee within thirty (30) days of the Petition Date. If the Debtors are required to provide 21 days' notice of the bid procedures portion of the Sale Motion, they may trigger a default under the post-petition loan documents depending on the availability of the Court in the last week of January. Accordingly the Debtors require the bid procedures portion of the Sale Motion to be heard on an expedited basis to comply with the deadlines imposed by Technology Funding.

26. The Debtors have also been in substantial negotiations with Technology Funding to sell substantially all of the Debtors' assets free and clear of all liens and encumbrances, and are extremely close to entering into an Asset Purchase Agreement. However, Technology Funding required the Debtors to file these bankruptcy cases no later than December 31, 2012 as a condition to potential purchase of the Debtors' assets. The Debtors will shortly seek to effectuate the sale to Technology Funding, subject to a competitive bidding process that is consistent with both the timing of these chapter 11 cases and the Debtors' fiduciary duties to maximize the value for their estates, stakeholders and parties in interest.

27. The Debtors have been unable to obtain the post-petition financing on an unsecured basis. The Debtors were also unable to obtain financing with a priority over any or all administrative expense claims. Prior to the Petition Date, the Debtors contacted a number of other potential lenders, however, no such entity was willing to offer credit to the Debtors on terms more advantageous to the Debtors than those which have been offered by the Lender.

28. The Debtors also hope that consensual agreements can be reached with their creditors, including the Internal Revenue Service, to enable the asset sale free and clear of liens.

## V.

## Information Required by Local Bankruptcy Rule 1007-2

29.  Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

30.  Set forth in Schedule 1 attached hereto is a list of the names and addresses of the creditors holding the 20 largest unsecured claims, excluding insiders. This list also includes the amount of each claim, and if applicable, an indication whether the claim is contingent, unliquidated, disputed or partially secured, subject to the Debtors' rights to dispute the actual validity of any claims.

31.  Set forth in Schedule 2 attached hereto is a list of the names and addresses of the Debtors' creditors holding the five largest secured claims. The list includes the amount of each claim, a brief description of the type of collateral securing the claim, an estimate of the value of the collateral, and whether the claim or lien is disputed, subject to the Debtors' rights to dispute the actual validity of any claims.

32.  A summary of the consolidated assets and liabilities of the Debtors as of December 31, 2012 is set forth in Schedule 3 attached hereto.

33.  There are no classes of shares of stock, debentures, and other securities of the Debtors that are publicly held.

34.  Set forth below is a list of the shares of stock, debentures and other securities of the Debtors held by each of the Debtors' officers and directors and the amounts so held:

**Kestrel Technologies, Inc.**

| Name | Title | Securities Held | Number |
|---|---|---|---|
| Edward L. Bishop III | Chairman, President & CEO | None | n/a |
| Donald B. Davies | Director | None | n/a |

8

| Todd Garliss | Director | Series A Preferred Stock | 39,053 |
| --- | --- | --- | --- |
| Charles Richard Tomkins | Director | Common Stock | 75,000 |

35. The Debtors do not have property that is in the possession or custody of custodians, public officers, mortgagees, pledgees, assignees of rents, or secured creditors, or agents for any such entity.

36. Set forth below is a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business:

| Premises | Description | Owned / Leased / Etc. |
| --- | --- | --- |
| 369 Lexington Ave. Suite 321 New York, NY 10017 | Executive suite office | Leased from Jay Suites II, LLC |
| 75 Broad Street New York, NY 10004 | Data Centre – Rack Space | Leased from Internap |
| 260 Spring Street New York, NY 10013 | Storage unit | Leased from Manhattan Mini Storage |
| 16 West Aylesbury Rd. Timonium, MD 21093 | Storage unit | Leased from Self Storage Plus Timonium |

37. Set forth below is the approximate location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States:

| Location | Assets |
| --- | --- |
| 369 Lexington Ave. Suite 321 New York, NY 10017 | Books and Records, Computer Equipment |
| Internap 75 Broad Street New York, NY 10004 | Computer Equipment |
| Manhattan Mini Storage 260 Spring Street New York, NY 10013 | Books and Records, Computer Equipment |
| Self Storage Plus Timonium 16 West Aylesbury Rd. Timonium, MD 21093 | Books and Records |

38. There is no action or proceeding, pending or threatened, against the Debtors where a judgment against the Debtors or a seizure of their property is imminent.

39. Set forth below are the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors and a brief summary of their relevant responsibilities and experience:

| Executive | Title | Tenure and Duties with Debtors |
|---|---|---|
| Edward L. Bishop, III | Chairman, President & CEO of Kestrel Technologies, Inc. <br><br> Manager of Kestrel Solutions, LLC | Founding CEO of Kestrel Technologies, Inc. in 1998, and its predecessor, Kestrel Technologies, LLC. Currently the Debtors' sole employee; responsible for all operations and management of the business. |

40. Set forth below is the estimated amount of payroll and fees, on a consolidated basis, to be paid to employees (exclusive of officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the thirty-day period following the filing of the Debtors' chapter 11 petitions:

**To Be Paid to Employees:**

| Payee | Title | Amount |
|---|---|---|
| None. | | |

**To Be Paid to Officers and Directors:**

| Payee | Title | Amount |
|---|---|---|
| Edward L. Bishop, III | Chairman, President & CEO | $15,000.00 |

**To Be Paid to Financial and Business Consultants:**

| Payee | Service | Amount |
|---|---|---|
| Lam Financial | Bookkeeping Services | $3,000.00 |
| **Eisner LLP** | Tax Consulting Services | $10,000.00 |
| **England Securities, LLC** | Financial Advisor re: Bankruptcy | $15,000.00 |

10

41. Set forth below are the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the thirty day period following the filing of the Debtors' chapter 11 petitions:

| Estimated Cash Receipts | |
|---|---|
| Borrowing from DIP Facility | $35,000 |
| Other | 0 |
| **Total Cash Receipts** | **$35,000** |
| | |
| **Estimated Cash Disbursements** | |
| Executive Compensation | $15,000 |
| Data Center Expense | 4,255 |
| Equipment Lease | 4,167 |
| Office Rent | 1,900 |
| Storage Unit Rentals | 750 |
| Travel & Misc. Expenses | 400 |
| Bank Fees | 200 |
| **Total Disbursements** | **$26,672** |

I, the undersigned, President and Chief Executive Officer of Kestrel Technologies, Inc. and Kestrel Solutions, LLC, declare under penalty of perjury that the foregoing is true and correct.

Dated: January 7, 2013.

/s/ Edward L. Bishop III
Edward L. Bishop, III
President and Chief Executive Officer

073811.00000 Litigation 8905023v1